IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>NORTHEASTERN DIVISION</u>

| | |
|---|---|
| RICHARD SHOWERS, JR. | ) |
| | ) |
| v. | ) CV. NO. 01-CO-8025-NE |
| | ) CR. NO. 98-CO-362-NE |
| UNITED STATES OF AMERICA | ) |

<u>MEMORANDUM OF DECISION</u>

Richard Showers, Jr. was charged in a six count indictment along with Deloris Askins Blackburn and Thomas Porter Miller. Showers, Blackburn and Miller were charged with a conspiracy to possess with the intent to distribute cocaine base ("crack") in violation of Title 21 U.S.C. § 846 and with five counts of having possessed with the intent to distribute cocaine base ("crack") in violation of 21 U.S.C. § 841. Showers was convicted on all counts except one possession with intent to distribute count. Showers was sentenced to concurrent terms of 210 months on all counts, concurrent supervised release terms of 60 months on all counts, a $25,000 fine and a special assessment of $500. On appeal, the Eleventh Circuit vacated the sentence and remanded the case for the court to resentence Showers without including as relevant conduct the purchase of crack cocaine by William Jones in the year preceding the conspiracy period charged in the indictment. On June 1, 2000 Showers was resentenced to 168 months in prison.

In this Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Showers raises three claims which are addressed below.

I.      <u>Whether trial counsel was ineffective for challenging jurisdiction</u>

The United States Supreme Court has established a national standard for judging the effectiveness of criminal defense counsel. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process

that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington,* 466 U.S. 668 (1984). The Court elaborated:

> [F]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendants of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

Ineffectiveness of counsel occurs only when the attorney's performance fell below an objective standard of reasonableness and, further, that but for the attorney's failure, the result of the proceeding would probably have been different. *Chadwick v. Green*, 740 F.2d 897 (11th Cir. 1984). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland, supra*, 466 U.S. at 690. There is a strong presumption that trial counsel's conduct is the result of trial strategy and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Sinclair v. Wainwright,* 814 F.2d 1516 (11th Cir. 1987), *citing Strickland v. Washington, supra* at 690.

     In his motion and his reply, movant argues that Congress did not have authority to enact 21 U.S.C. §§ 841(a) and 846; therefore, the government did not have jurisdiction to prosecute him, and the court did not have jurisdiction to try him. Showers argues that Congress did not have legislative authority under the Commerce Clause to enact 21 U.S.C. § 841 and he cites *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) in support of his position. In *Lopez*, the

Court held that the Gun-Free School Zones Act of 1990 which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone" exceeded Congress's authority under the Commerce Clause. The Supreme Court did not hold that Congress does not have the authority to enact criminal laws in general pursuant to the Commerce Clause. In *Lopez*, the Court stated:

> ...[W]e have identified three broad categories of activity that Congress may regulate under its commerce power. ... First, Congress may regulate the use of the channels of interstate commerce. ... Second, congress is empowered to regulated and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. ... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... i.e., those activities that substantially affect interstate commerce, ...
>
> Within this final category, ... the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce.

514 U.S. at 558-59. (citations omitted).

The court then considered 18 U.S.C. § 922(q), the statute at issue in that case, in light of the above framework. The court concluded that § 922 did not fit within the first or second categories. The court further concluded that § 922 did not fit within the third category:

> Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms.
>
> ....
>
> Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.

3

> ....
>
> [T]o the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question Hall substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here.

514 U.S. at 561-63.

Prior to the Supreme Court case of *Lopez*, in the coincidentally named case of *United States v. Lopez*, 459 F.2d 949 (5th Cir. 1972), the Fifth Circuit Court of Appeals relied upon the findings of Congress in holding that Congress acted within its power under the Commerce Clause when it enacted 21 U.S.C. §§ 841(a)(1) and 846:

> As the basis for the exercise of its power under the Commerce Clause to regulate certain activities in controlled substances, Congress made certain findings and declarations which are set forth in § 101 of Title II of the Act, 21 U.S.C. § 801. Principal among these were the findings that intrastate incidents of the traffic in controlled substances, such as manufacture, local distribution and possession, had a substantial and direct effect on interstate commerce; that such intrastate incidents of the traffic in controlled substances swelled the interstate traffic in such substances; that it was impossible to distinguish between substances manufactured and distributed intrastate from those manufactured and distributed interstate and, therefore, it was not feasible to distinguish between such substances in terms of controls; and that control of the intrastate incidents of traffic in controlled substances was essential to the control of interstate incidents of that traffic. Obviously, there was a rational basis for these findings because they stemmed from statistical reports and extensive testimony as to the extent of the drug traffic and the unauthorized use of drugs. Moreover, Congress had a rational basis for finding that controlled substances manufactured and distributed on an intrastate basis could not be differentiated from those manufactured and distributed on an interstate basis.
>
> A large percentage of controlled substances, especially those held or manufactured for illicit sale, are unlabeled, thereby making a determination of their source of origin extremely difficult or

> impossible. The form in which they are held or consumed adds to the difficulty or impossibility of this determination.
>
> From such a finding, Congress could reasonably assume that an attempt to separate intrastate activities in controlled substances from those which were conducted on an interstate basis would be a futile exercise substantially interfering with its power to regulate interstate commerce in these substances; a power upon which any attempt to end or alleviate the drug abuse problem would necessarily be based.
>
> Past attempts to regulate interstate commerce in controlled substances had failed because of the difficulty or impossibility of determining the substance's source of origin. To make another attempt at controlling interstate commerce in controlled substances without regulating both intrastate and interstate activities in these substances would be ineffective.

459 F.2d at 952-53.

See also, *United States v. Weinrich*, 586 F.2d 481, 498 (5th Cir. 1978) (21 U.S.C. § 841(a)(1) is constitutional even though it does not require interstate nexus as element of conviction); *United States v. Bernard*, 47 F.3d 1101, 1102 (11th Cir. 1995) ("Possession and sale of illegal drugs impacts interstate commerce.")

Since the Supreme Court decision in *Lopez*, all of the circuits addressing Commerce Clause challenges to 21 U.S.C § 841 have upheld it. See *United States v. Brown*, 276 F.3d 211 (6th Cir.2002), *cert. denied*, 535 U.S. 1079 (2002); *United States v. Westbrook*, 125 F.3d 996, 1009 (7th Cir. 1997), *cert. denied*, 522 U.S. 1036 (1997); *United States v. Edwards*, 98 F.3d 1364, 1369 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1170 (1997); *United States v. Orozco*, 98 F.3d 105, 107 (3d Cir. 1996); *United States v. Kim*, 94 F.3d 1247, 1249-50 (9th Cir. 1996); *United States v. Bell*, 90 F.3d 318, 321 (8th Cir. 1996); *United States v. Lerebours*, 87 F.3d 582, 584-85 (1st Cir. 1996), *cert. denied* 519 U.S. 1060 (1997); *United States v. Genao*, 79 F.3d 1333, 1336 (2d Cir. 1996); *United States v.*

*Wacker*, 72 F.3d 1453, 1475 (10th Cir. 1995); *United States v. Clark*, 67 F.3d 1154, 1166 (5th Cir. 1995), *vacated on other grounds*, 519 U.S. 802 (1996); *United States v. Leshuk*, 65 F.3d 1105, 1111-12 (4th Cir. 1995). Although the Eleventh Circuit has not ruled on this particular issue, the court is confident that when it does, there will be unanimity among the circuits.

Because Congress <u>did</u> have authority to enact § § 841 and 846, Showers cannot show prejudice based on counsel's failure to challenge jurisdiction.

II.  Whether trial counsel was ineffective for not requiring
    <u>the government to prove that the cocaine was crack</u>

Martha Odom, retired forensic scientist with the Alabama Department of Forensic Sciences, testified as follows:

> Q. Would you look at Government's Exhibit 1, please, and tell me what the weight of that substance was?
>
> A. Yes. Exhibit Number 1 weighed 2.9 grams or one-tenth of an ounce.
>
> Q. It did test positive for cocaine base?
>
> A. Yes.
>
> Q. Exhibit 2?
>
> A. Exhibit 2, laboratory analyses revealed the presence of cocaine; the weight is 0.07, or 2 one-thousandths of an ounce.
>
> ....
>
> Q. Exhibit 3?
>
> A. Exhibit 3 weighed 12.2 grams or 0.4 ounce.
>
> Q. And then Exhibits 2 and 3 did test positive for the presence of cocaine base?
>
> A. Yes, they did.

....

THE COURT: Before you go on, may I ask you, you say cocaine base?

THE WITNESS: Yes, sir.

THE COURT: Is cocaine base commonly referred to as "crack," or is there some distinction –

THE WITNESS: Yes, sir. That's – the slang name is crack cocaine, but it is cocaine in the base form; as opposed to the powder form, which is hydrochloride salt.

THE COURT: When you refer to the substance as cocaine base, you're using that as a synonym for crack cocaine?

THE WITNESS: Yes, sir.

BY MS. BROWN:

Q. Let me ask you this – of the three exhibits, do they all appear to be a rock-like substance?

A. Yes, a compressed material.

Q. Compressed white material?

A. Yes. Well it's sort of an off-white material.

(R-264-66).

Ed C. White, forensic chemist with the Alabama Department of Forensic Sciences, testified concerning the results of his tests on Exhibits 4 and 5:

A. That each one of these exhibits was cocaine base.

Q. And by cocaine base, do you – does that also mean crack?

A. Yes, ma'am, it does.

....

> Q. How much did Exhibit 4 weigh?
>
> A. It weighed 3.0 grams, or 0.1 ounce. And Exhibit 5 weighed 1.09 grams, or 0.03 ounce.

(R-271-72).

The testimony of the forensic experts was sufficient proof that the substances that were Government's exhibits 1 -5 were crack cocaine.

The government was not required to prove that the substance contained sodium bicarbonate.

The commentary to U.S.S.G. § 2D1.1(c), Note(D) states:

> (D) "Cocaine base," for the purposes of this guideline, means "crack." "Crack" is the street name for a form of cocaine base, <u>usually</u> prepared by processing cocaine hydrochloride and sodium bicarbonate, and <u>usually</u> appearing in a lumpy, rocklike form.

(Emphasis added).

In *United States v. Jones*, 159 F.3d 969, 982-83 (6th Cir. 1998) the court recognized:

> The definition, through the use of the word "usually," serves merely to illustrate a common method of conversion. See *United States v. Abdul*, 122 F.3d 477, 479 (7th Cir.), *cert. denied,* ___ U.S. ___, 118 S.Ct. 643, 139 L.Ed.2d 621 (1997). If we were to disregard the qualifying term "usually," crack dealers could avoid the penalties for distribution of crack simply by finding some substitute for sodium bicarbonate in production, or by crushing the rocks so that the final product resembles powder. Although crack might generally be produced using sodium bicarbonate production via sodium bicarbonate is not the exclusive preparation method recognized for purposes of § 2D1.1. We conclude that the qualifer "usually" in the phrase "usually prepared ... with sodium bicarbonate" is an acknowledgment that other methods of crack preparation exist and that not all forms of "cocaine base" need contain sodium bicarbonate to qualify as crack for sentencing purposes; the Commission's reference to sodium bicarbonate is merely illustrative. Accordingly, the presence of sodium bicarbonate is not a necessary prerequisite to a district court's factual determination that cocaine base is crack. *See*

>*Abdul*, 122 F.3d at 479; *United States v. Stewart*, 122 F.3d 625, 627 (8th Cir. 1997).

Whether a particular substance is crack cocaine is a question of fact to be determined by the district court. *Edwards v. United States*, 523 U.S. 511 (1998). The Court of Appeals for the Eleventh Circuit has recognized that the cocaine base "and its distinct physical forms, such as coca paste and crack cocaine are chemically indistinguishable." *United States v. Sloan*, 97 F.3d 1378, 1382 (11th Cir. 1996), *cert. denied,* 520 U.S. 1277 (1997). The Eleventh Circuit has also recognized that crack cocaine is sufficiently physically distinguishable to allow persons to confirm that they have distributed it. *Sloan*, 97 F.3d 1383, n.8. *See also United States v. Brown*, 156 F.3d 813, 816 (8th Cir. 1998) ("among the most knowledgeable experts on crack are those who regularly smoke it or sell it."); *United States v. Robinson*, 144 F.3d 104 (1st Cir. 1998).

There was sufficient evidence that the substances were crack cocaine. Showers has failed to show prejudice based on counsel's failure to challenge the government's proof.

III.   Whether trial counsel was ineffective for failing to argue that the government failed to prove a conspiracy between Showers and his alleged co-conspirators

In the Government's response (doc. #174), the Government outlined the evidence underlying the conspiracy:

>On March 19, 1997, task force agents met with confidential source Steve Wilson to arrange a purchase of crack cocaine from appellant-Blackburn. In preparation for the buy, Wilson was searched, fitted with a wire transmitter, and given $300 of drug task force funds. [R4-101, 102, 180] Surveillance team members followed as Wilson proceeded to an area near the Cherokee Bend Apartments in Huntsville. [R4-182, R5-302] Wilson and "Crunch" proceeded to apartment 146 of the Winter Park Apartments, Huntsville, Alabama, the residence of appellant-Blackburn. [R4-183, 184, R5-302, 303].

Wilson met with appellant-Blackburn and placed his order. He told Blackburn that he would need one-quarter ounce of crack cocaine, and he provided her with $300 cash. Blackburn told Wilson that she would have to pick-up the crack from her source, and she indicated that her source was "Dr. Shower's boy." [R4-110, 183, 303] Wilson counted out $300 cash, and Blackburn left. [R4-184].

On March 27, 1997, task force agents arranged a second controlled buy from appellant-Blackburn, this time using confidential source Denise Nance. [R4-117, 187] Nance met with Blackburn at Blackburn's apartment. While Nance was inside the apartment, surveillance officers observed a Ford Mustang bearing Alabama License DG608 enter the complex. [R4, 116, 126-27] Officers traced the license through NCIC and determined that the vehicle was a 1989 Ford Mustang registered to Richard Showers, Jr. [R4, 116, 126-27, 188-190].

Shortly after the arrival of Shower's vehicle, Nance exited Blackburn's apartment with a quantity of crack cocaine. She met with officers at a predetermined location, and released the crack to them. [R5-190] She told officers that a tall, heavy set black man delivered the crack cocaine to Deloris Blackburn [R5-337] The crack was evaluated for quantity and content by the Alabama Department of Forensic Sciences, and determined to be .07 grams of crack cocaine. [R5-265].

On March 28, 1997, task force agents arranged a third controlled buy from Blackburn using confidential source Steve Wilson. Wilson, wearing a wire transmitter, placed an order for half-an-ounce of crack cocaine from Blackburn. [R4-119, 191, 306-308] While the course was inside Blackburn's apartment, agents conducting surveillance observed the Ford Mustang belonging to Richard Showers, Jr. parked outside of Blackburn's apartment. [R4-120-21, R-5-225] Wilson witnessed Showers hand Blackburn a package and leave [R5-308] Agents videotaped appellant-Showers as he left Blackburn's apartment. [R4-192]

After Showers left, Blackburn turned to Wilson, and handed Wilson the package that Showers had just handed to her. [R5-308] Wilson paid Blackburn $500 cash and left. Wilson turned the package over to surveillance agents. The crack was evaluated for quantity and content by the Alabama Department of Forensic Sciences, and determined to be 12.2 grams of crack cocaine. [R5-265].

On April 6, 1997, agents working with confidential sources Boris and Phyllis Harper, arranged to purchase yet another quantity of crack from Blackburn. [R4-127, R5-225, 355-56, 381] Agents fitted Boris Harper with a wire transmitter, and provided him with Drug Task Force funds. Boris and Phyllis Harper, accompanied by Steve Wilson, who did not know at the time that he was participating in a controlled buy, met with Blackburn at 4116 Newsome Road, Apartment 146. Blackburn insisted that Harper give her the money, and she would pick up his order at the home of her supplier. [R5-355, 381] Harper refused to give Blackburn the money, insisting that she would receive cash on delivery. [R4-130, R5-355, 381] Blackburn left the Harpers at her apartment, and went to the home of her supplier in an attempt to pick up Boris Harper's order without the case. She returned several hours later and explained that her supplier would not give her the order without cash. Blackburn agreed to let the Harpers follow her in a separate car, to her supplier's home. [R5-314, 356, 384-86] The Harpers and Wilson followed Blackburn to the corner of University and Oster Drive. Surveillance team members followed close behind. [R4-130, R5-224] At the corner of University and Oster, Harper gave Blackburn the funds, and watched as Blackburn drove a short distance down Oster to 1100 Oster Drive, the home of Richard Showers, Jr. [R4-131, R5-357, 385] Blackburn returned a short time later and delivered crack cocaine to the Harpers. [R5-226, 358, 388] The crack was evaluated for quantity and content by the Alabama Department of Forensic Sciences, and determined to be 3.0 grams of crack cocaine. [R5-272] Through a check with Huntsville Utilities, surveillance agents were able to determine that the utilities at 1100 Oster Drive were registered to appellant-Showers. [R4-131].

On April 14, 1997, agents fitted Denise Nance with a wire transmitter, and provided her with $160 task force funds. [R4-133] Nance, followed by agents, picked up Blackburn, and Thomas Porter Miller at 4116 Newsome Road, and drove them to 1100 Oster Drive. [R4-134] During the drive, Blackburn and appellant-Miller began to argue about how much crack cocaine they were going to buy. [R5-339] When they arrived, Nance waited in the car while Blackburn and Miller went inside. Blackburn and Miller returned a short while later, and the exchange took place. The crack was evaluated for quantity and content by the Alabama Department of Forensic Sciences, and determined to be 1.09 grams of crack cocaine. [R5-272]

Based upon the evidence obtained during the five controlled buys outlined above, members of the drug task force obtained and executed

11

a search warrant at 1100 Oster Drive on May 15, 1997. Officers seized approximately $4,350 cash, a loaded Sig Sauger 9mm pistol, a scanner used to monitor police frequencies, a grand new 1997 CBR Honda Motorcycle, a Ford Mustang and a 1992 Pontiac. [R4-145, R5-243, 257] Agents found receipts indicating that the Pontiac, and the Honda were purchased with cash within eight months of the search. [R4-145, R5-290, 294] Agents also found receipts bearing appellant-Showers' name, indicating that between January and May of 1997, the period of the conspiracy, the appellant had made cash purchases for clothes, sunglasses and shoes totaling in excess of $1,700. [R5-285 thru 287, 289, 290, 291, 293, 294] After receiving his Miranda warnings, appellant-Showers told agents that he had not had a job since January of 1996. [R5-230]

In addition to the evidence set out above, the government called witness James McDonald. McDonald testified that he lived with Blackburn during the period of the conspiracy, and that the two of them had a platonic relationship. [R5-427] He testified that he'd seen Blackburn with crack on four to five occasions, and that he has seen appellant-Showers deliver crack cocaine to Blackburn. [R5-428, 429] He testified that, on at least one occasion, he saw appellant-Miller distribute crack cocaine, and that Miller got his supply of crack cocaine from Blackburn. [R5-429, 430]

On rebuttal, the government called William "T-T" Jones. Jones testified that he was a crack cocaine dealer, currently serving federal time for a drug related offense. Jones testified that in the early part of 1996, his primary supplier was an individual named James Blackburn. When James Blackburn was unable to provide him with crack, Jones purchased crack from appellant-Showers and another individual named Buster Scruggs. [R6-522] Jones testified that between early and mid-1996, he purchased crack cocaine from Showers on four occasions. On three occasions, he purchased an ounce, on one occasion he purchased four and a half ounces from appellant-Showers. [R6-522]

The evidence of a conspiracy of which the defendant was a participant was not only sufficient, but overwhelming.

(Doc. #174, pp. 7-11).

In *United States v. Toler*, 144 F.3d 1423,1426 (11th Cir. 1998), the Eleventh Circuit Court of Appeals discussed the elements of conspiracy and how a conspiracy may be proved:

> [T]he elements of the offense of conspiracy under 21 U.S.C. § 846 are: (1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means. See *United States v. Parrado*, 911 F.2d 1567, 1570 (11th Cir. 1990) ("To support a conspiracy conviction under 21 U.S.C. § 846, the government must prove that there is an agreement by two or more persons to violate the narcotics laws."); 2 Wayne R. La Fave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.4 at 60 (1986).
>
> Because the crime of conspiracy is "predominately mental in composition," *United States v. Shabani*, 513 U.S. 10, 16, 115 S.Ct. 382, 386, 130 L.Ed.2d 225 (1994), it is frequently necessary to resort to circumstantial evidence to prove its elements. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'"); *United States v. Gold*, 743 F.2d 800, 824 (11th Cir. 1984) ("'The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'") (quoting *United States v. Ayala*, 643 F.2d 244, 248 (5th Cir. Unit A 1981)) (brackets omitted). Consequently, the government need not demonstrate the existence of a "formal agreement," *Gold*, 743 F.2d at 824, but may instead demonstrate by circumstantial evidence "'a meeting of the minds to commit an unlawful act.'" *United States v. Awan*, 966 F.2d 1415, 1434 (11thCir. 1992) (quoting *United States v. Parker*, 836 F.2d 1473, 1478 (11th Cir. 1988)).

In *United States v. Calderon*, 127 F.3d 1314, 1326 (11th Cir. 1997) the court explained:

> [T]he conclusion that appellants had a common purpose and plan with the other coconspirators may be inferred from a "development and collocation of circumstances." One of those circumstances is repeated presence at the scene of the drug trafficking. That circumstance standing alone can give rise to a permissible inference of participation in the conspiracy. While not sufficient in and of itself to convict, the

13

> inference is a "material and probative factor that the jury may consider in reaching its verdict."

127 F.3d at 1326 (citations omitted).  See also, *United States v. Gamboa*, 166 F.3d 1327 (11th Cir. 1999).

There was testimony that Showers was present at the scene of at least two of the drug buys – on March 27, 1997 and March 28, 1997.  With respect to the March 27, 1997 drug buy, the confidential informant left Blackburn's apartment with crack cocaine shortly after the arrival of Shower's vehicle at the apartment complex.  The informant testified that a tall heavy set black man delivered the crack cocaine to Blackburn.  With respect to the March 28, 1997 drug buy, the confidential informant testified that Showers handed Blackburn a package and left.  Blackburn then handed the confidential informant the package which contained crack cocaine.  On two occasions (April 6, 1997 and April 14, 1997), Blackburn provided cocaine to confidential informants only after she first went to Shower's residence at 1100 Oster Drive.

The court concludes that there was sufficient evidence to allow a reasonable jury to convict Showers of conspiracy; therefore, Showers cannot show prejudice based on the alleged deficient performance of counsel.

Finally, the court notes that Showers has also filed a document entitled "Intervening Constitutional Law" (Doc. #198) in which Showers argues that under *Blakely v. Washington*, 524 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), based on the jury's verdict, the court could not enhance Shower's sentence based on any amount of cocaine base ("crack") in excess of five grams or for obstruction of justice.

14

The Eleventh Circuit Court of Appeals recently held that the rule announced in *Blakely* and, more recently in *United States v. Booker*, ____ U.S. ____, 125 S.Ct. 738, ____ L.Ed.2d ____ (2005), does not apply retroactively to cases on collateral review. This claim is therefore not properly before the court.

After consideration of the petition, the positions of the parties and the applicable law, Mr. Shower's motion for relief pursuant to 28 U.S.C. § 2255 is due to be and the same is hereby DENIED in its entirety.

Done this 30th day of March 2005.

                                                                                            L. SCOTT COOGLER
                                   UNITED STATES DISTRICT JUDGE
                                                              124153